## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WILDA GRACE LESTER, | ) | CASE NO. 5:20-cv-01364 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Wilda Grace Lester, ("Plaintiff" or "Lester"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further consideration consistent with this opinion.

---

[1]     On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On August 17, 2017, Lester filed an application for POD and DIB alleging a disability onset date of February 2, 2015[2] and claiming she was disabled due to diabetes, vision problems, depression, anxiety, peripheral neuropathy, asthma, back problems, and migraines.  (Transcript ("Tr.") at 76, 223, 238.)  The applications were denied initially and upon reconsideration, and Lester requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 99, 112.)

On January 24, 2019, an ALJ held a hearing, during which Lester, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 46.)  On April 10, 2019, the ALJ issued a written decision finding Lester was not disabled.  (*Id*. at 27-38.).  The ALJ's decision became final on April 20, 2020, when the Appeals Council declined further review.  (*Id*. at 1-3.)

On June 22, 2020, Lester filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 11, 12.)  Lester asserts the following assignments of error:

> (1)    The ALJ's RFC determination is not supported by substantial evidence because he failed to provide adequate rationale as to why all opinions of record were rejected.

(Doc. No. 10 at 1.)

# II.  EVIDENCE

## A.    Personal and Vocational Evidence

Lester was born in 1967 and was fifty-one years-old at the time of her administrative hearing, making her a "person closely approaching advanced age," under social security regulations.  (Tr.

---

2        At the hearing, Lester amended her alleged onset date to January 1, 2016, due to significant earnings in the prior year.  (Tr. 50.)

37.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has ninth grade education and is able to communicate in English.  (*Id.*)  She has past relevant work as an in-home caregiver and warehouse worker.  (*Id*. at 271.)

**B.     Relevant Medical Evidence**[3]

**1.        Mental Impairments**

On December 12, 2017, consultative examiner George W. DeMuth, M.D., performed a consultative psychological evaluation of Lester. (Tr. 745.)  Lester reported that she had no history of mental health treatment, lived with her husband and was able to perform activities of daily living independently, including cooking, cleaning, grocery shopping, caring for her dog, and managing her finances. (*Id*. at 746.)  She reported an "average" childhood, but indicated that her mother's boyfriends were physically abusive towards her. (*Id*.) Dr. DeMuth observed that she was alert, well oriented, her demeanor was cooperative, and her speech was unremarkable, but notable for a tangential, rambling stream of thought. (*Id*.)  She described her mood as "nervous" and she presented as depressed with a tearful affect. (*Id*.)  She was unable to perform serial 7 subtractions from 100, but she was able to perform serial 4 additions from 1, as well as perform simple calculations and solve simple word problems.  (*Id*. at 748). She could recite five digits forward, and three in reverse. (*Id*.)  She was able to identify the current president and three large United States cities and could calculate two of three single-digit multiplication problems. (*Id*.)  She did not know how many weeks were in a year. (*Id*.) Dr. DeMuth indicated that she was Lester exhibited good effort on testing.(*Id*.) Dr. DeMuth's diagnoses were depressive disorder due to diabetes, and cannabis use disorder,

---

[3]      The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

moderate. (*Id*. at 745.)  Dr. DeMuth opined that Lester was moderately impaired in her ability to understand, remember, and carry out instructions and to respond appropriately to supervision, coworkers, and work pressures in a work setting. (*Id*. at 748.) He opined that Lester's level of intellectual functioning appeared to be in the average range, and she appeared to have appropriate insight into her current situation. (*Id*.)

On January 16, 2018, Lester had a follow-up visit for treatment of diabetes and neuropathy with Dr. Kristine Ortega. (*Id*. at 860.)  She reported "some little bit of trouble sleeping," denied any depression or anxiety, and a mental status examination indicated that she was cooperative with an appropriate mood and affect. (*Id*. at  860-61).

On May 24, 2018, Dr. Carol Grant, M.D., performed a consultative evaluation of Lester.  (*Id*. at 797.) Lester reported "experiencing feelings of depression and anxiety for the past 10 years," including "occasional prolonged periods of sadness and feelings of hopelessness." (*Id*.)  Dr. Grant observed that her mood, affect, and speech were normal.  (*Id*. at 798.)

On November 1, 2018, Lester was treated by Crystal Botello, FNP.  (*Id*. at 997.)  Lester reported depression and anxiety, but no sleep disturbance, recent stress or suicidal ideation. (*Id*. at 1000.)  Nurse Botello observed that she showed good judgment, "normal" mood and affect, was active and alert, and she was oriented to time, place, and person. (*Id*.)

### 2. Physical Impairments

On January 8, 2015, Lester was diagnosed with type 1 diabetes when she presented to the ER with extreme nausea and vomiting. (*Id*. at 410, 1063.) She had previously been given diabetes medications, but stopped taking them because they caused diarrhea.  (*Id*. at 410.)   She was diagnosed with severe ketoacidosis, with a glucose level of 717,  and was started on a protocol with

4

insulin as well as significant fluids. (*Id*. at 411-12.)

On March 17, 2015, Lester had a follow-up appointment with Aaron A. Bertalmio, M.D., for her diabetes treatment. (*Id*. at 501.) Dr. Bertallmio noted that her symptoms were improving, but her "home blood glucose trend is increasing steadily." (*Id*.) She was positive for shortness of breath with exertion, and was negative for depression, "but admits that she is frustrated about her medical conditions." (*Id*. at 503.) Blood tests were ordered and she was referred for diabetic education. (*Id*. at 504.)

On April 30, 2015, she had another follow up appointment with Dr. Adel Aziz, and reported that she had expereinced paresthesia and intermittent tightness throughout her legs "for almost 20 years." (*Id*. at 511.) Dr. Aziz noted she had "normal mood and affect," and "[h]er behavior is normal." (*Id*. at 513.)

On October 14, 2015, Dr. Yen-Yi Peng performed a neurological evaluation of Lester. (*Id*. at 605.) She reported her paresthesia, numbness, and tingling were increasing despite quitting alcohol eight months prior. (*Id*.) Dr. Peng indicated that Lester's symptoms were suggestive of peripheral neuropathy, most likely caused by her diabetes mellitus and history of alcoholism. (*Id*.) He noted her muscle tone was symmetric but pin sensation was noted below the mid-calf region. (*Id*. at 609.)

On December 11, 2017, Dr. Alan M. Babb performed a consultative evaluation of Lester. (*Id*. at 739.) His examination found that abduction of her shoulders and her straight leg raises were within normal limits. (*Id*. at 741.) Her grip strength was full and her sensory motor examination, reflexes, dexterity and gait were normal. (*Id*.) Dr. Babb described her mood as "appropriate" and indicated that her effort and motivation appeared to be extremely poor as she planned to leave the state of Alabama within a few months. (*Id*.) Imaging from that day revealed mild disc height loss

5

and degenerative disease at L5-S1. (*Id*. at 743.)

On May 24, 2018, Dr. Carol Grant, M.D. performed a consultative evaluation of Lester. (*Id*. at 797.) Lester reported experiencing low back pain for the previous 10 years, and stated she was currently experiencing constant pain in her lower back. (*Id*.) Pulmonary studies were significant for a moderate-to-severe obstructive ventilator impairment. (*Id*. at 797.) She had a normal gait, could ambulate without an assistive device and was able to squat and heel and toe walk. (*Id*. at 799.)

On November 1, 2018, Lester was treated by Crystal Botello, FNP. (*Id*. at 997.) On physical exam, Nurse Botello noted tenderness throughout Lester's cervical, thoracic, and lumbar spine. (*Id*.)

An x-ray of Lester's spine was performed on the same day, and was notable for moderate multilevel neuroforaminal narrowing, most pronounced at C4-C5 with multilevel endplate osteophytes and arthrosis present. (*Id*. at 1013.) Thoracic imaging was notable for moderate multilevel intervertebral disc space narrowing. (*Id*.) In Lester's lumbar spine, imaging showed mild facet arthrosis at the L4-L4 and L5-S1 levels. (*Id*.)

On January 8, 2019, Lester saw James Musick, PA, and reported back pain as her primary concern. (*Id*. at 1018.) On examination, PA Musnick noted generalized pain to palpation throughout Lester's cervical, thoracic, and lumbar spine, with some tender points noted in the mid-lumbar and thoracic areas. (*Id*. at 1018.) She did not report claudication but did have positive pain to extension of her back. (*Id*. at 1020.) PA Musick prescribed meloxicam for her back pain. (*Id*.)

## C. State Agency Reports

### 1. Mental Impairments

On January 25, 2018, State agency consultant Gloria Roque, Ph.D., reviewed the record and opined that Lester had the following "moderate" limitations to her residual functional capacity

("RFC"):

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- work in coordination with or proximity to others without being distracted by them;

- interact with the general public;

- respond appropriately to changes in the work setting;

- be aware of normal hazards and take appropriate precautions;

- travel in unfamiliar places or use public transportation; and

- set realistic goals and make independent plans.

(Tr. 95-6.)  Dr. Roque opined that Lester "has the intellectual capacity to understand simple and detailed instruction" and could "carry out simple instructions consistently," but "substance use would interfere with her ability to carry out detailed instructions at times."  (*Id*. at 96.)  Dr. Roque opined that Lester would function best with her own work area/station without close proximity to crowds, would benefit from a familiar, predictable work routine and should avoid frequent contact with large groups of people.  (*Id*.)  Dr. Roque further opined that Lester should have only non-intensive and limited contact with the public, casual contact with coworkers, and could adapt to only infrequent, well-explained changes in the workplace.  (*Id*.)

On May 2, 2018, Sally Rowley, Psy.D., reviewed the record at the reconsideration stage of administrative review, and opined that Lester had the following "mild" limitations to her RFC:

- understanding, remembering, or applying information;

- interacting with others;

- concentrating, persisting, or maintaining pace; and

- adapting or managing oneself.

(*Id*. at 125.)

### 2. Physical Impairments

On January 25, 2018, State agency consulting physician Robert H. Heilpern, M.D., reviewed the record and opined that Lester had the following limitations to her physical RFC:

- could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds:

- could stand, walk and sit (with normal breaks) about six hours in an eight hour workday;

- could never climb ladders, ropes, or scaffolds;

- should avoid concentrated exposure to extreme heat, extreme cold, vibration, fumes, and machinery; and

- should avoid all exposure to hazards.

(*Id*. at 94.)

On June 11, 2018, State agency consulting physician Minerva Hernandez, M.D., reviewed the record and opined that Lester had the following limitations to her physical RFC:

- could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds:

- could stand, walk and sit (with normal breaks) about six hours in an eight hour workday;

- could occasionally stoop, and climb ladders, ropes, or scaffolds; and

- should avoid concentrated exposure to fumes, and machinery.

(*Id*. at 128.)

8

D.    **Hearing Testimony**

During the January 24, 2019 hearing, Lester testified to the following:

- Her diabetes has been limiting her ability to work.  When her numbers are low, she cannot see, and her body starts to shut down.   When her numbers are high, she's critical to go into a coma.  (*Id*. at 50-51.)

- He blood sugar is low enough to affect her vision on a daily basis.  She sees a great big white dot.  (*Id*. at 51.)

- To bring her blood sugar back up, she has to eat.  It takes an hour to an hour and a half after eating before she is able to function.  (*Id*. at 52.)

- She has bifocals that she is supposed to wear, that help reduce the glare and blur she sees when she is driving.  (*Id*. at 53.)

- She tests her blood sugar about six times a day, and takes insulin shots four times a day.  Usually she is usually is able to control her blood sugar.  (*Id*. at 54.)

- She feels her diabetes is uncontrolled, because when she goes on the special diabetic diet, her body loses weight and muscle mass in her legs. She believes this contributes to her neuropathy.  (*Id*. at 55.)

- She has had neuropathy at least since 2015.  Before her diabetes diagnosis, she thought it was restless leg syndrome.  She gets really bad charley horses, and cramps which deform her feet. She also gets cramping in her calves and falls frequently.  (*Id*. at 55-56.)

- Cramping in her legs happens three or four times a month, and the severity depends on how much activity she does.  (*Id*. at 56-57.)

- Her diabetes medications cause side effects including depression and anxiety.  She used to be a people person, but now just wants to find a hole and go crawl in it and hide.  (*Id*. at 57.)

- She has breathing problems.  Sometimes when she walks up stairs, or even walks short distances, she can't breathe.  She first tries to catch her breath.  If that doesn't work, she has a nebulizer she uses once or twice a week.  It takes her five to ten minutes to recover, or a little longer of she uses the inhaler.  (*Id*. at 58-59.)

- She also gets short of breath while cleaning.  She used to be able to clean a one-bedroom home in two hours.  Now it takes her all day.  (*Id*. at 60.)

9

- Her back hurts from her neck to her tailbone. The pain is constant in her back all day, and sometimes goes down into her legs, but she doesn't know if that is part of the back pain or neuropathy. (*Id*.)

- Bending over or overdoing her activities triggers back pain. Bending, kneeling, and squatting are difficult for her. Pushing a vacuum triggers back pain, too. She hasn't found anything that helps relieve the pain. (*Id*. at 61.)

- She has had migraines since she was a child, but they have become worse since she became diabetic. Currently, she has three or four a month. They last all day, and she has to stay in bed, because she is hypersensitive to lights and sound, and is unable to eat, which exacerbates her diabetes. (*Id*. at 63.)

- She has no warning of when a migraine is coming on because she has a headache every day. (*Id*. at 64.)

- She was an alcoholic, but stooped drinking after receiving her diabetes diagnosis. (*Id*.)

- She has five beautiful children, who are all grown. She doesn't spend time with her grandkids because they live in Nevada. (*Id*. at 64-65.)

- Her days are mostly spent sitting on the couch and watching television. She has a service dog, and takes him for walks of about half a mile. She has to stop and try to sit or relax a minute about every two blocks along the way. (*Id*. at 65-66.)

- Standing still is harder for her, because it causes a burning sensation in her back. She can only stand for about ten minutes at a time. (*Id*. at 66.)

- Sitting too long hurts, too. She can only sit for about ten or fifteen minutes before she needs to stand and stretch. Sometimes her legs wake her in the middle of the night, and she has to get up and walk. (*Id*. at 67.)

- She had carpel tunnel in both her hands, and it has affected her ability to grip. It is hard to hold a pencil for a long period of time, and her writing has gotten sloppier. (*Id*. at 68.)

- She can make her own meals, shower, dress and sometimes grocery shops alone, but usually has the help of her husband. (*Id*. at 68-69.)

- Since she stopped drinking, she doesn't socialize much. (*Id*. at 69.)

10

The VE testified Lester had past work as a home health aide and warehouse worker.(*Id*. at 70.)  The ALJ then posed the following hypothetical question:

> If we were to assume a hypothetical individual, limited to light exertion, as defined in the regulations, except as follows.  Occasional overhead reaching, frequent handling and fine fingering, occasional climbing ramps or stairs, no climbing ladders or scaffolds, occasional . . . balancing, crouching or crawling.  No exposure to unprotected heights or hazards, like moving machinery.  We need to avoid exposure to dust, odors, fumes, and other pulmonary irritants.  And understand, remember, and carry out simple routine instructions.  Would this eliminate the past relevant work?

(*Id*. at 70-71.)

The VE testified the hypothetical individual would not be able to perform Lester's past work as a home health aide or warehouse worker.  (*Id*. at 71.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as sales attendant, marker, or mail sorter.  (*Id*.)

Next, the ALJ amended the hypothetical to add a visual limitation restricting the hypothetical individual to reading ordinary newspaper or book print or larger print.  (*Id*.)  The VE testified this would not affect the representative jobs he identified.  (*Id*.)

Next, the ALJ amended the hypothetical to add a limitation restricting the hypothetical individual to occasional handling or fingering.  (*Id*. at 72.)  The VE testified that this would eliminate the three representative jobs he identified.  (*Id*.)  The only representative job that this hypothetical individual could perform was furniture rental clerk.  (*Id*.)

Next, the ALJ amended the hypothetical to add a limitation restricting the hypothetical individual to being unable to complete a full workday twice a month.  (*Id*.)  The VE testified this would not be compatible with competitive work.  (*Id*.)

Lester's counsel asked if additional fifteen minute breaks in the morning and afternoon would

11

affect competitive employment.  (*Id*. at 73.)  The VE testified this would prevent the individual from performing a job effectively, and eventually lead to job loss.  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be

disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Lester was insured on her alleged disability onset date, January 1, 2016, and remains insured through March 31, 2019, her date last insured ("DLI.")  (Tr. 30.)  Therefore, in order to be entitled to POD and DIB, Lester must establish a continuous twelve month period of disability commencing between these dates.   Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on March 31, 2019.

2.    The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of January 1, 2016 through her date last insured of March 31, 2019.

3.    Through the date last insured, the claimant had the following severe impairments: multilevel degenerative disc disease (DDD), chronic obstructive pulmonary disease (COPD)/asthma, diabetes mellitus, history of carpal tunnel syndrome repair, depression disorder, anxiety disorder, and substance use disorder.

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

13

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light exertion work as defined in 20CFR 404.1567(b) except as follows: occasionally reach overhead; frequently handle and finger; occasionally climb ramps and stairs; never climb ladders or scaffolds; occasionally balance, couch or crawl; no exposure to unprotected heights or hazards like moving machinery; avoid exposure to dust, odors, fumes and other pulmonary irritants; and, understand, remember and carryout simple, routine instructions.

6.    Through the date last insured, the claimant was unable to perform any past relevant work.

7.    The claimant was born on March **, 1967 and was 52 years old, which is defined as a younger individual age 18-49, on the date last insured.[4]

8.    The claimant has limited education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.    Through the date last insured, considering the claimant's age, educations, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from February 2, 2015, the alleged onset date, through March 31, 2019, the date last insured.[5]

(Tr. 30-38) (internal citations omitted).

## V.  STANDARD OF REVIEW

---

[4]    Although neither party raised this issue, the ALJ appears to have miscalculated. Based on her birth date, Lester should have been catagorized as a "person closely approaching advanced age" (age 50-54) under 20 CFR 404.1563.

[5]    Again, the ALJ seems to have erred, because the hearing transcript documents that, at the hearing, Lester, acting through counsel, amended her alleged onset date to January 1, 2016.  (Tr. 2016.)

14

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: Whether the ALJ's RFC determination is supported by substantial evidence**

Lester asserts that the ALJ's RFC determination is not supported by substantial evidence because he failed to provide adequate rationale as to why all opinions of record were rejected. (Doc. No. 10 at 6.) She asserts that the ALJ erred because he "failed to properly weigh the opinion of

16

consultative examiner Dr. DeMuth and State agency psychologist Dr. Roque." (*Id*. at 7.)  She argues that the ALJ indicated that the opinion of Dr. DeMuth was" unpersuasive" because it lacked supportability and was inconsistent with the record, yet failed to meet his obligation to support this finding with substantial evidence by identifying any record evidence which was in conflict with the opinion.  (*Id*. at 10.)  She notes the ALJ used a similar rational in discounting Dr. Roque's opinion, finding that the opinion was contrary to Lester's independence in activities of daily living and improvement with medications.  (*Id*.)  Again, Lester argues that the ALJ failed to meet her statutory responsibility to provide an accurate and logical bridge between the evidence and the resulting decision by omitting any explanation of how Lester's activities of daily living contradict the "very reasonable limitations" contained in Dr. Roque's opinion.  (*Id*. at 10-11.)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Dr. DeMuth's and Dr. Roque's opinions, and therefore the ALJ appropriately omitted the limitations included in their opinions from his RFC finding and hypothetical questions posed to the VE.  (Doc. No. 11 at 8.)  He notes that the ALJ was properly applying a new set of regulations for evaluating medical evidence that differ substantially from prior regulations.  (*Id*.)

Since Lester's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations")  for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a).  Rather, the

17

Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[6] (2) consistency;[7] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this

---

[6]     The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[7]     The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The Social Security Agency's express intention in adopting the Revised Regulations was to re-focus judicial review on the critical issue of whether an ALJ's decision was supported with

substantial evidence.[8]  Therefore, Lester's claim that the ALJ's RFC determination is not supported

by substantial evidence because he failed to provide adequate rationale as to why all opinions of

record were rejected falls squarely within both the letter and the intent of the Revised Regulations.

In support of her argument, Lester discusses at length the alleged inadequacy of the ALJ's treatment

of two opinions in particular: the opinion of consultative examining psychologist Dr. DeMuth, and

the opinion of State agency reviewing psychologist Dr. Roque.[9]

### 1.       The Opinion of Consultative Examiner Dr. DeMuth

In his Decision, the ALJ addressed Dr. DeMuth's opinion as follows:

> During a psychiatric evaluation on December 12, 2017, Dr. George DeMuth, M.D.,
> opined the claimant had a moderate limitation in the ability to understand, remember
> and carry out instructions and respond appropriately to supervisors, coworkers and
> work pressures in a work setting.  The undersigned finds less persuasive the opinion
> of Dr. DeMuth due to lack of support and inconsistency with the record.  The
> limitation is vague and conclusory with no explanation of why the claimant had a
> moderate limitation.

(Tr. 36.)

Dr. DeMuth opined that Lester was moderately impaired in her ability to understand,

---

[8]      The state rationale for the revision included the concern that:
> Courts reviewing claims under our current rules have focused more on
> whether we sufficiently articulated the weight we gave treating source
> opinions, rather than on whether substantial evidence supports our final
> decision. As the Administrative Conference of the United States'
> (ACUS) Final Report explains, these courts, in reviewing final agency
> decisions, are reweighing evidence instead of applying the substantial
> evidence standards of review, which is intended to be highly deferential
> standard to us.
82 Fed. Reg. at 5853; see 81 Fed. Reg. at 62,572

[9]      Although the ALJ also deemed all the medical opinions of record "unpersuasive,"
Lester does not address her medical RFC in her brief, and there is significantly
more objective medical evidence in the record, providing alternate sources of
support for the ALJ's findings.  That argument is therefore deemed waived.

remember, and carry out instructions and to respond appropriately to supervision, coworkers, and work pressures in a work setting. (*Id*. at 748.) He opined that Lester's level of intellectual functioning appeared to be in the average range, and she appeared to have appropriate insight into her current situation. (*Id*.) Dr. DeMuth identifies his data sources as a form provided by the Disability Determination Service, and Lester's report at their interview.  (*Id*. at 745.)  However, in his substantive assessment of her sensorium and cognitive functioning, he describes the results of a number of psychological tests he performed, including basic mathematical calculations,[10] tests of semantic similarity,[11] interpretation of metaphors,[12] questions eliciting knowledge of basic geography and current events,[13] memory,[14] and hypothetical questions relating to everyday events.[15]  (*Id*. at 748.)  Given Dr. DeMuth's detailed description of the testing that he performed, it is unclear what

---

[10]    These included serial 7 subtractions and serial 4 addition, single digit multiplication and simple word problems.  (Tr. 748.)

[11]    These included identifying the similarity between an orange and a banana, which she stated were "not similar," and identifying the similarity between a dog and a lion, which she stated were "vicious."  (Tr. 748.)

[12]    Lester explained the proverb about spilled milk meant "get up and do it again," while the proverb about glass houses meant "shouldn't be talking (expletive)." (Tr. 748.)

[13]    Lester correctly identified the current and preceding Presidents, three famous people, identified three large cities and gave details of a current news item, but could not identify the number of weeks in a year.  (Tr. 748.)

[14]    Lester gave a "detailed description of the trip to the examination," gave birth dates of significant people in her life and her previous employment, described the meals she ate in the prior 24 hours and recited five digits forward and three in reverse.  She could not recall the age at which she left school.  (Tr. 748.)

[15]    For example, "when asked what she would do if thick smoke was observed coming from the window of a neighbor's home, she replied, 'make sure everyone's out, call 911.'" (Tr. 748.)

the ALJ means when citing "lack of support." The factor of supportability is defined by the Revised Regulations as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). It is not clear whether the ALJ is referring to a lack of internal support within the consultative examiner's report, or external support within the evidentiary record as a whole. The state agency reviewing psychologists both cited Dr. DeMuth's report as an evidentiary basis for their opinions regarding Lester's mental RFC, suggesting the internal support provided for his conclusion by the psychological testing he performed and documented was deemed adequate by other professionals in his field. (Tr. 91, 109.) Yet dismissing a consultative examiner's report based on a lack of support within the record as a whole undermines the purpose of such an examination. The regulations set forth two primary reasons why the Social Security Agency will purchase a consultative examination: "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." 20 CFR § 404.1519a(b). Here, there was no medical record evidence of mental health treatment for the period prior to Dr. DeMuth's consultative evaluation, suggesting the examination was purchased to address deficiencies in the medical evidence. An ALJ's dismissal of a consultative examining opinion because it lacks support in the record as a whole, when it documents a period where no other medical record evidence exists, would undermine a primary purpose of purchasing the examination: filling in informational gaps where the record is insufficient to allow an ALJ to make a determination.

The ALJ also explains that Dr. DeMuth's opinion is unpersuasive because it is

22

"inconsistent[] with the record," but fails to identify any contemporaneous record evidence in conflict with the opinion. (Tr. 36.) Elsewhere in the opinion, the ALJ notes that "the claimant's mental condition improves and stabilizes with treatment." (*Id*. at 35.) He cited a February 2015 treatment record from her medical doctor which noted "Depression - stable. Continue Remeron," and a November 2018 treatment record which states "patient reports ongoing battle with dep[ression] and anxiety for several years [due to] chronic illness . . . . [patient] reports she is feeling better while on paroxetine . . . will refill medication and [follow up] in 4 [weeks] to assess for improvement pending psych consult." (Tr. 494, 1001-2.) Dr. DeMuth examined Lester in December 2017, nearly three years after the first note and a year prior to the second. There is no evidence cited showing that Lester was receiving treatment at the time of Dr. DeMuth's assessment, and the records the ALJ cited are dubious support for the proposition that medication effectively controlled her mental health conditions given that the first medication appears to have been discontinued, and the second note reflects an initial trial of a medication which still needed to be evaluated for efficacy. Further, the fact that evidence suggests that Lester's condition improved with treatment in November 2018 does not address the critical twelve-month durational requirement of a finding of disability.

Further confusing the issue, earlier in his Step Four analysis, the ALJ recites some of Dr. DeMuth's findings and expressly relies on them in establishing that Lester has moderate limitations in the area of concentrating, persisting or maintaining pace:

> At the psychological evaluation, the claimant was able to unable to [sic] complete serial sevens, but was able to perform serial four additions and simple math calculations. The State agency consultant opined the claimant had a moderate limitation in the ability to concentrate, persist, or maintain pace. Further, the State agency consultant opined the claimant could sustain attention to perform simple tasks for 2-hour periods in an eight hour workday. Thus, the weight of the evidence supports a finding of moderate limitation in this area of functioning.

23

(*Id*. at 32.)  The Commissioner argues that the ALJ's decision to rely on Dr. DeMuth's finding in one section of the evaluation, and dismiss them as "unpersuasive" four pages later, is intended to demonstrate Dr. DeMuth's inconsistency, explaining "[t]he ALJ also addressed consistency, noting that Dr. DeMuth's opinion was inconsistent with his own objective findings as well as the other record evidence."  (Doc. No. 12 at 11.)  In fact, although the ALJ did cite Lester's successful performance on some of Dr. DeMuth's memory tests, he does not state anywhere in the opinion that "Dr. DeMuth's opinion was inconsistent with his own objective findings."  Further, he bases his determination that Lester has mild limitations in the area of understanding, remembering, or applying information on the opinions of the state agency reviewing psychologists, both of whom were also deemed "unpersuasive" by the ALJ at the subsequent step of this review.  (Tr. 32, 36.)

Finally, as Lester points out, the ALJ's assertion that Dr. DeMuth's limitations are unpersuasive because they are "vague and conclusory" is inexplicable.  Dr. DeMuth detailed the testing and observations on which he based his opinion.  The ALJ himself relied on these reported results for many of the mental RFC findings in his Decision.  Further, Dr. DeMuth expressed the limitations he perceived in the same language used by the Social Security Agency itself, opining that "[b]ased on the findings of this evaluation, Ms. Lester appears moderately impaired in her ability to understand, remember, and carry out instructions and to respond appropriately to supervision, co-workers, and work pressures in a work setting."  These terms have specific, clearly-defined meanings describing mental functioning in the context of a Social Security disability assessment.

### 2.    The Opinion of State Agency Reviewing Psychologist Dr. Roque

The Revised Regulations explain, "[a] prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our

Federal and State agency medical and psychological consultants at a prior level of review ... in [a claimant's] current claim based on their review of the evidence in [the claimant's] case record[.]" 20 C.F.R. § 404.1513(a)(5).  State agency reviewing psychologist Dr. Roque's opinion falls into this category of consideration.

On January 25, 2018, Dr. Roque, reviewed the record and opined that Lester had the following "moderate" limitations to her RFC:

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- work in coordination with or proximity to others without being distracted by them;

- interact with the general public;

- respond appropriately to changes in the work setting;

- be aware of normal hazards and take appropriate precautions;

- travel in unfamiliar places or use public transportation; and

- set realistic goals and make independent plans.

(Tr. 95-6.)  Dr. Roque opined that Lester "has the intellectual capacity to understand simple and detailed instruction" and could "carry out simple instructions consistently," but "substance use would interfere with her ability to carry out detailed instructions at times."  (*Id*. at 96.)  He opined Lester would function best with her own work area/station without close proximity to crowds, and would benefit from a familiar, predictable work routine and should avoid frequent contact with large groups of people.  (*Id*.)  Dr. Roque further opined that Lester should have only non-intensive and limited contact with the public, casual contact with coworkers, and could adapt to only infrequent, well-explained changes. (*Id*.)

The ALJ addressed Dr. Roque's opinion as follows:

> The undersigned finds unpersuasive the opinion of Dr. Roque due to inconsistency and lack of support with the record.  The record shows that the claimant is independent with her activities of daily living.  Additionally, the claimant's mental condition improves with medication.  However, during her psychological evaluation, the claimant had difficulty performing serial sevens although she was able to perform simple math calculations and serial fours.  Therefore, the undersigned finds the claimant can perform within the limit to simple, routine instructions.

(Tr. 36.)  As noted above, Dr. Roque also opined that Lester could "carry out simple instructions consistently." (*Id*. at 96.)  Therefore, the ALJ appears to be identifying one element of Dr. Roque's decision that he found credible.  However, the ALJ cites other elements of Dr. Roque's opinion elsewhere in the Decision to support his other findings.  For example, he states "[t]he State agency consultants opined that the claimant had a mild limitation in the ability to understand, remember or apply information," citing Dr. Roque's opinion.  (*Id*. at 32.)  In his assessment of Lester's ability to concentrate, persist, or maintain pace, he writes "the State agency consultant opined the claimant could sustain attention to perform simple tasks for 2-hour periods in an 8-hour workday," again citing Dr. Roque.  (*Id*.)

Although not raised specifically by Lester, the ALJ treated the other State agency reviewing psychologist's opinion in the same inconsistent manner.  He cited her opinion as support for his findings that Lester had mild limitations in her the ability to understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself, while deeming the opinion "unpersuasive . . . due to a lack of support and inconsistency with the record."  (*Id*. at 32-33, 36.)  He also deemed the State agency reviewing physician's opinions "unpersuasive due to lack of support and inconsistency with the record," despite adopting nearly all of their limitations.  (*Id*. at 36.)

26

The core complaint in Lester's appeal is not the ALJ's handling of any one of the opinions, but rather the cumulative effect of deeming all the opinions of record unpersuasive while at the same time relying on selected fragments of the opinions as the basis of his own Decision.  The Revised Regulations provide that, where an ALJ finds that there are equally persuasive  medical opinions or prior administrative medical findings about the same issue but where they are not exactly the same, administrative law judges "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or decision." 20 C.F.R. § 404.1520c(b)(3).  Presumably, the same procedure applies when all opinions on an issue are equally unpersuasive.

There is no regulatory requirement that the ALJ deem any opinion of record "persuasive."  However, the regulations do require that the ALJ clearly explain his consideration of the opinions and identify the evidence supporting his conclusions. In this case, the ALJ failed to fulfill that obligation with sufficient specificity to provide an accurate and logical bridge between the evidence and the resulting decision.  The Commissioner argues that Lester asks this Court to reweigh the evidence presented in this case.  (Doc. No. 11 at 15.)  This Court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  However, the Court cannot perform even that limited oversight function in a case such as this, where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011).

Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning.

Here, the ALJ's mental RFC determination is not supported by substantial evidence because he failed to provide adequate explanation of his consideration of the relevant opinion evidence.  Therefore, this case should be remanded to allow the ALJ to explain the apparent contradiction of his repeated, direct reliance on portions of opinions that he deemed to be unpersuasive, unsupported, and inconsistent with the record; to explain when and to what degree he determined that Lester's mental functional capacity improved with treatment during the relevant period; accurately identify the alleged onset date; and to allow him to assess Lester in the appropriate age category under 20 CFR § 404.1563.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further consideration consistent with this opinion.


*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date:  December 11, 2020

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**